Jerome L. Skinner
LHD Lawyers/US
PO Box 9300
Cincinnati, Ohio
Ohio Supreme Court Number: 14768
Skinair64@yahoo.com
(513) 831 0044

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **DAVID FRIDAY,** individually and Representatively as surviving spouse of Carol Friday Dec'd. and as the surviving parent of Grieg Friday, Dec'd.<br><br>6 Hume Court<br>Ashwood, VIC, Australia 314<br><br>Plaintiff,<br><br>v.<br><br>**AIRLINE TRAINING CENTER ARIZONA, INC.**<br><br>1685 S Litchfield Rd<br>Building 104<br>Goodyear, Az. 85338<br><br>Defendant. | No.   CV-16-859-PHX-ESW<br><br>COMPLAINT AND<br>JURY DEMAND |

## INTRODUCTION

1. One hundred and fifty people died when Andreas Lubitz (Lubitz"), the co-pilot on Germanwings Flight 4U9525, locked the Captain out of the cockpit, took control of the plane, and intentionally flew the Düsseldorf bound jet into the French Alps.

2. With the exercise of reasonable and ordinary care, the Airline Training Center Arizona, Inc. ("ATCA") in Goodyear Arizona could have prevented this predictable tragedy.

3. Lubitz spent almost a year in Goodyear Arizona training to become a Lufthansa/Germanwings pilot. During his training, ATCA knew that Lubitz suffered mental illness and declared Lubitz "unflyable."

4. ATCA hid its concerns that Lubitz posed a danger. ATCA further endangered passengers and crew when it violated express Federal regulations and endorsed Lubitz.

## BACKGROUND

5. Carol Friday (68) and her son Grieg Friday (29) were passengers on Germanwings Flight 4U9525. The Fridays were Australian citizens. Carol and Grieg are survived by David Friday, Carol's husband and Grieg's father. David Friday is an Australian citizen and the appointed representative for both estates. David Friday also acts representatively on behalf of Alexandra Friday, his daughter with Carol and the sister of Grieg Friday. David Friday is entitled to bring this action.

6. Carol Friday was special person. Carol held three professional certificates in Nursing, Nursing Obstetrics and Operating Room Nursing. Carol also held a Bachelor's Degree in Advanced Nursing and a Graduate Certificate in Psychiatric Nursing. When she died death she was a Maternal and Child Health Care Nurse at with City of Casey. She was on a Mother-Son vacation with Grieg when the accident occurred.

7. Grieg Friday led a remarkable life. Greg held a Diploma in Mechanical Engineering. Greg used his education to operate his own construction and remodeling business. When Lubitz flew into the Alps, Grieg was 32.

8. Carol and Greg were on a special Mother-Son vacation l when they died.

9. Defendant ATCA ("Defendant" or "ATCA") is an Arizona Corporation. ATCA's principle place of business is in Goodyear Arizona.

10. ATCA is a wholly-owned subsidiary of Lufthansa Flight Training GmbH ("LFTG"), a German corporation, and ATCA's ultimate parent is Deutsche Lufthansa AG (Lufthansa German Airlines or "Lufthansa") also is a German corporation.

11. Lufthansa is the parent corporation to a "portfolio of companies

consist[ing] of network airlines, low-cost carriers and aviation service companies." Lufthansa "is a global aviation group with a total of around 540 subsidiaries and equity investments, which in the financial year 2014 were organized into five business segments: Passenger Airline Group, Logistics, MRO, Catering and, up to the end of 2014, IT Services."

12. In 1997, Lufthansa outsourced its flight training to LFTG. LFTG owns and operates flight schools in Europe (Frankfurt, Berlin, Bremen, Essen, Munich, Rostock-Laage, and Vienna) and in the United States (Goodyear Arizona). Lufthansa owns and controls the planes that ATCA uses for flight training.

13. ATCA has a critical role in the training of Lufthansa's flight training program. Student pilots who train at the Lufthansa Flight Training Pilot School in Bremen Germany are required to complete a major part of their practical training in Goodyear/Phoenix. The Arizona training center, which is located in the Arizona desert, offers outstanding flying and weather conditions.

14. Dirk Kroeger heads Lufthansa's Pilot Schools Division including the Bremen training center and ATCA. Mr. Kroeger also serves as a Director of ATCA.

**Lubitz Flight Training, Depression, and ATCA Finding That Lubitz Is Unflyable**

15. Lubitz started his flight training on September 1, 2008 at the LFTG Bremen Germany campus. After two months, Lubitz became severely depressed. During his depressive episode, Lubitz had suicidal ideation.

16. The Bremen training center allowed Lubitz on November 5, 2008 to suspend his training and receive treatment.

17. While in treatment, Lubitz made several *"no suicide pacts"* with his treating psychiatrist, was hospitalized, and took the anti-depressants: Cipralex and Mirtazapin. Mirtazapin is the same medication the medical examiner found in Academy Award winning actor Robin Williams when Mr. Williams committed suicide in 2014.

18. After a ten months, Lubitz on August 26, 2009, resumed training. Lubitz

3

completed his Bremen training on October 13, 2010 when he passed his ATPL written exam.

19. Lubitz followed the LFTG practice and continued his training in Goodyear Arizona. He started training on November 8, 2010. During his training, ATCA questioned Lutbitz's stability. Several post-crash accounts reveal that at least one person at ATCA declared Lubitz "unflyable."

20. Despite declaring Lubitz "unflyable," ATCA training records failed to document the finding. ATCA's failure to record its finding is important. Training records typically follow the student, in this case, Lubitz, throughout the student's professional career.

21. Lubitz completed his training in Goodyear Arizona on March 2, 2011.

22. From June 2011 until December 31, 2013, Lubitz worked as a Lufthansa flight attendant.

23. Lubitz joined Germanwings in January of 2014 and became a Germanwings co-pilot in June 2014.

**Lubitz Commits Suicide and Kills Innocent Passengers and Crew**

24. On March 24, 2015, one hundred and forty-four passengers and six crew members boarded Germanwings Flight 4U9525 in Barcelona Spain. The flight's destination was Düsseldorf Germany.

25. Lubitz was the flight's co-pilot.

26. Approximately thirty minutes into the flight, the flight's Captain left the cockpit. The Captain requested that Lubitz, as co-pilot, take control of radio communications.

27. As soon as the Captain left the cockpit, Lubitz took control of the plane's instruments and altered the plane's programed speed and altitude. The unplanned change in speed and altitude caused an air traffic controller to contact the cockpit; Lubitz refused to respond.

28. When he returned to the cockpit door, the Captain fervently buzzed the

cockpit and tried to reenter the cockpit. Lubitz refused to disengage the lock.

29. Unable to unlock the door, the Captain frantically pounded on the door. Unfazed by the Captain's desperation, Lubitz continued to control the flight and ignore radio communications.

30. In front of the passengers and crew, the Captain fervently pounded and plead with Lubitz for reentry. The Captain's visible desperation undoubtedly terrorized the passengers including Plaintiff's decedents. Everyone on board certainly understood that their life was about to end.

31. Approximately ten minutes after Lubitz took command, the GPWS warning announced "Terrain, Terrain, Pull Up, Pull Up." The warning announcement continued until Lubitz deliberately flew Flight 4U9525 into the French Alps.

32. A post-crash review of Lubitz medical history revealed that Lubitz was severely depressed.

33. The medical records established that Lubitz suffered a psychotic depressive episode comparable to the episode that he suffered during flight training. When he killed himself and the passengers and crew, Lubitz and was taking anti-depressant medications including Mirtazapine 15 mg and Lorazepam 1 mg.

## JURISDICTION AND VENUE

34. This Court has jurisdiction to decide this case pursuant to 18 U.S.C. § 1332 (a) (2) in that the value of the matter in controversy is in excess of $75,000 and this is action between the subjects of a foreign country, Australia, and an Arizona citizen. Since ACTA is not a carrier, the provisions of the Montreal Convention do not apply.

35. Venue is proper in this Court because ATCA's principal place of business is Goodyear Arizona and the wrongful and negligent acts that give rise to this action took place in Goodyear Arizona. ACTA does not exist in any other State or in the country of Australia where Plaintiff and Plaintiff's decedents were/are residents and citizens.

## CLAIMS

# FIRST CLAIM

## NEGLIGENT FAILURE TO DOCUMENT, RETAIN, AND SHARE INFORMATION CONCERNING A PILOT'S MENTAL DISORDER

36. Plaintiff reasserts every allegation previously asserted as if fully rewritten.

37. Lubitz suffered a serious depressive episode while training at the Bremen training facility and the facility allowed Lubitz to suspend training to receive treatment and recover. Based on the interrelationship of the Bremen training facility with ATCA and the overlap of management, ATCA knew or reasonably should have known that Lubitz had a history of serious depressive illness.

38. When Lubitz arrived at ATCA, ATCA knew or reasonably should have known that Lubitz had a history of depression that required Lubitz to suspend flight training. ATCA should have known that Lubitz underwent therapy, was hospitalized, took anti-depressant medication, and entered into *"no suicide pacts"* with his treating psychiatrist.

39. Based on Lubitz's known history of severe mental illness, ordinary and reasonable care required ATCA to closely monitor Lubitiz and record any sign of mental disability.

40. Based on behavior that ATCA observed, ATCA also knew that Lubitz's mental disorder made him "unflyable."

41. Recognizing the dangers posed by mentally disturbed pilots, the Federal Aviation Administration ('FAA") requires flight schools to monitor a student to detect if a student could be suffering any psychological abnormality. The FAA in its published Aviation Instructor's Handbook requires a flight instructor to stop teaching any student "who may be suffering from a psychological abnormality." Other violations of Federal Aviation Regulations may have been committed by ATCA include but not limited to:

    a. 14 CFR part 61.53 in permitting Lubitz to operate a plane with the knowledge that Lubitz was suffering from a current medical deficiency.

    b.    14 CFR part 141. (c) 5 by failing to obtain or question all of Lubitz flight training records from Bremen where Lubitz has been suspended for treatment for depression.

    c.    14 CFR part 141. 101 by failing to establish and maintain a current and accurate record of Lubitz prior training in Bremen including his suspension for a mental disability.

    d.    14 CFR part 141. 85 *et seq*, when its Chief Flight Instructor, a corporate employee and an FAA certified flight instructor, failed to certify Lubitz training record, to insure that the record was complete and accurate, containing all the information pertinent to Lubitz training in Bremen and his suspension for a mental disability.

    e.    14 CFR part 141. 85 *et seq*, when its Chief Flight Instructor failed to maintain standards for the school that would be acceptable to the Admistrator (FAA) when ATCA permitted Lubitz, who demonstrated chronic symptoms of depression and dysthymia while preparing and obtaining a pilot's license, to create a danger to passengers and other pilots.

42.    The FAA, consistent with its recognition that mentally disturbed pilots are dangerous and that flight schools have a duty to detect mental illness and prevent mentally ill trainees from becoming pilots, instructs training schools in the Aviation Instructor's Handbook, FAA-H-8083-9, that the flight instructor's "primary legal responsibility" is to endorse a student to become a pilot. The FAA further states that **if "the instructor believes that the student may have a serious psychological deficiency, such endorsements and recommendations must be withheld."** (Emphasis added.)

43.    The FAA understands and ATCA in the exercise of ordinary and reasonable care should understand that a mentally ill/ depressed pilot poses a risk to

7

himself and to passengers, crew members, and others. In failing to insure that Lubitz record was complete or in failing to identifying his symptoms, ACTA in every aspect noted above violated FAA standards of conduct and failed to act reasonable and prudent.

44. Aviation incident reports document a history of depressed pilots hurting themselves and exposing others to danger required.

45. Based on this history, ATCA knew or should have known that at least 12 recent incidents have occurred in which a pilot or crew member with possible mental health issues caused or could have caused serious injuries to himself and others. In many of the cases, the flight crew member kept his illness a secret. The twelve examples are described below:

 A. **18/01/2015 A320 Condor Portugal:**
  The airplane was in cruise at FL370 approximately 60 NM from Lisbon when the co-pilot became incapacitated, and could no longer perform his duties. The Captain diverted to Faro, where the plane landed uneventfully. The copilot was then transported to the hospital, where he exhibited behavior during the following days that raised psychiatric concerns.

 B. **29/11/2013 ERJ 190 LAM Namibia:**
  The airplane was in cruise at flight level FL380 when the co-pilot left the cockpit to go to the toilet, leaving the Captain alone. On three occasions, different altitudes were selected to order a descent to the ground with autopilot. The CVR showed variable levels of aural warnings, as well as noises of repeated knocking and calls, corresponding to attempts to get into the cockpit. Thirty-three people died.

 C. **27/03/2012 A320 JetBlue USA:**
  As the plane was leaving New York-JFK and climbing in altitude in its scheduled five-hour flight to Las Vegas, the Captain said

something to the first officer (FO) about being evaluated by someone, but the FO did not know what he meant. The Captain then talked about his church and the need to "focus" and asked the FO to take the controls and work the radios. The Captain began talking about religion, but, according to the FO, his statements were not coherent. The FO became concerned when the Captain said "things just don't matter." According to the FO, the Captain yelled over the radio to air traffic control and instructed them to be quiet. The Captain turned off the radios in the aircraft, dimmed his monitors, and sternly admonished the FO for trying to talk on the radio. When the captain said "we need to take a leap of faith," the FO stated that he became very worried. The Captain told the FO that "we're not going to Vegas" and began giving what the FO described as a sermon. The FO suggested to the Captain that they invite the off-duty JetBlue captain who was on board the flight into the cockpit. However, the Captain abruptly left the cockpit to go to the forward lavatory, alarming the rest of the flight crew when he didn't follow the company's protocol for leaving the cockpit. When flight attendants met the Captain and asked him what was wrong, he became aggressive and banged on the door of the occupied lavatory, saying he needed to get inside. While the Captain was in the lavatory, at the request of the FO, a flight attendant brought the off-duty captain to the cockpit, where he assisted the FO with the remainder of the flight. When the Captain exited the lavatory, he began talking to flight attendants, mentioning "150 souls on board." The Captain walked to the rear of the aircraft but along the way stopped and asked a male passenger if he had a problem. The Captain then sprinted back to the forward galley and tried to enter

his code to re-enter the cockpit. When the FO announced over the public address system an order to restrain the Captain, several passengers assisted and brought him down in the forward galley, where he continued to yell comments about Jesus, September 11, Iraq, Iran, and terrorists. The FO declared an emergency and diverted the aircraft to Amarillo (Texas), landing with passengers still restraining the Captain in the galley. He was removed from the aircraft and taken to a facility in Amarillo for medical evaluation.

D. **30/07/2009 Saab 340B Mesaba:**

The flight was in cruise with 33 passengers on board when the cockpit crew was alerted by a passenger that the single flight attendant had become "no longer coherent" and was performing "numerous unusual activities." The captain instructed the passenger to get the flight attendant seated and the beverage cart stowed, and then diverted to a nearby airport. The flight attendant was transported to a local emergency room and diagnosed with "acute anxiety." There were no indications that the flight attendant had any pre-existing medical or psychiatric conditions.

E. **28/01/2008 B767 Air Canada North Atlantic Ocean:**

The aircraft was operating a scheduled passenger service from Toronto (Pearson) to London (Heathrow). On first contact with Shannon ATC the Commander made a PAN call and requested a diversion to Shannon Airport due to a medical emergency. The First Officer's behavior became belligerent and uncooperative which convinced the Commander he was now dealing with a crewmember who was effectively incapacitated The aircraft landed safety at Shannon where medical assistance was waiting to meet the aircraft.

F. **23/01/2001 DC-3 Galaxy Air Cargo USA:**

The airplane departed an island runway in Alaska during dark night

VFR conditions without filing a flight plan. The airplane collided with a volcanic mountain at 1,500 feet msl on the runway heading, 4.5 miles from the airport. The captain's medical certificate had previously been considered for denial after serving 49 months in federal prison for cocaine distribution, but after review, the FAA issued the captain a first class medical. FAA medical records for the captain do not contain any record of monitoring for substance abuse. The first officer's medical had also been considered for denial after an episode of a loss of consciousness. After a lengthy review and an appeal to the NTSB, the FAA issued the first officer a second-class medical. A toxicological examination of the captain, conducted by the FAA, found cocaine and metabolites of cocaine. A toxicological examination of the first officer found two different prescription antidepressant drugs. Two people died.

G. **31/10/1999 B767 EgyptAir North Atlantic Ocean:**
The airplane was in cruise at flight level FL330 with a flight crew consisting of a Captain, a duty co-pilot and a relief co-pilot. The duty co-pilot left the cockpit, and the relief co-pilot took his place in the right seat. Eight minutes later, the Captain left the cockpit in turn, leaving the relief co-pilot alone. The autopilot was then disengaged and nose-down inputs were recorded on the FDR. The airplane descended. The engines were shut down. The Captain returned to the cockpit and tried to take back control of the airplane. The Captain repeatedly asked the co-pilot to help him to pitch up the airplane ("pull with me") but the latter continued to command the elevator to pitch nose down. The airplane regained altitude before descending again. Two hundred and seventeen people died.

H. **11/10/1999 ATR-42 Air Botswana; Botswana:**

The pilot, the only person on board, deliberately flew the airplane into the ground by crashing at Gaborone airport. The validity of his license had been revoked for medical reasons. The pilot died.

I. **19/12/1997 B737 Silk Air Indonesia:**

While the aircraft was in cruise at 35,000 ft, the flight recorders stopped recording one after the other. The airplane suddenly started to descend. No Mayday message was transmitted before or during the descent. The aircraft crashed into a river. The safety investigation was not able to identify any technical problem that would make it possible to explain the accident. The crash caused the death of one hundred and four people.

J. **09/05/1996 BAC 1-11 British Airways France:**

The airplane was in cruise between Birmingham (UK) and Milan (Italy) when the first officer complained of feeling unwell, stating that he was "frightened of the altitude". The commander summoned the purser onto the flight deck using a single chime of the cabin staff call system. The first officer refused the offer of oxygen and a soft drink. He continued to show symptoms of anxiety and stress, such that the purser felt unable to comply with the standard incapacitation drill which calls for the crew member to be slid back in the seat with the harness locked. The Captain decided to divert to Lyon, France where the plane landed without further incident. The interviews conducted after the incident revealed that it was not the first time this first officer acted like this, and he admitted having taken psychotropic medication, without declaring it to the aeromedical authorities.

K. **21/08/1994 ATR42 Royal Air Maroc Morocco:**

The Captain disengaged the autopilot and deliberately directed the aircraft towards the ground. The co-pilot was in the cockpit but was

not able to counter the Captain's actions. The resulting crash killed forty-four people.

L. **09/02/1982 DC-8 Japan Airlines Japan:**
After having disengaged the autopilot on final approach at a height of 164 ft, the pilot pushed the control column forward and set the thrust levers on idle. He then moved the thrust levers of engines 2 and 3 to the reverse idle position. While the aircraft's attitude decreased, the co-pilot tried to pull on the control column. The co-pilot was unable to raise the nose of the airplane because the Captain was pushing forward on the control column with both hands. The aircraft crashed into the sea 510 m short of the runway. The investigation led by a Commission of the Ministry of Transport of Japan showed that the captain's actions resulted from a mental problem. He was suffering from schizophrenia. When the plane crashed into the water, twenty-four people died.

46. ATCA, despite knowing that FAA guidelines and reasonable and ordinary care required ATCA to closely monitor Lubitz and to document behavior that might reflect a recurrence of mental illness, failed to monitor Lubitz.

47. ATCA, despite knowing that the FAA guidelines and reasonable and ordinary care required ATCA, to document in training records any indication that Lubitz could suffer a recurrence of mental illness, failed to document Lubitz's behavior. Indeed, ATCA's training records failed to show that ATCA found Lubitz "unflyable".

48. As a direct and proximate cause of ATCA's failure to exercise reasonable and ordinary care and follow FAA rules, Germanwings permitted Lubitz to serve as a co-pilot on Flight 4U9525. Germanwings, during the post-crash investigation, repeatedly announced that it was unaware of Lubitz's history of mental disease and that ATCA had found Lubitz unflyable.

49.   If ATCA properly had followed FAA rules and exercised reasonable and ordinary care by monitoring and documenting Lubitz's behavior, Germanwings would have known that Lubitz presented a significant danger to passengers and to the crew. ATCA's failure to exhibit reasonable and ordinary care, therefore, allowed Lubitz to take control of the cockpit and fly Flight 4U9525 into the French Alps.

50.   As a proximate result of ATCA's failure to follow FAA guidelines and exercise reasonable and ordinary care, Plaintiff suffered the loss of his wife and son and the deceased suffered personal injuries including but not limited to physical pain and accompanying suffering and emotional distress.

## SECOND CLAIM

## WRONGFUL DEATH and SURVIVAL DAMAGES

51.   Plaintiff reasserts every allegation previously asserted as if fully rewritten.

52.   Pursuant to Arizona Revised Statute §12-611, Plaintiff as the surviving spouse and surviving parent brings this claim for survival damages and wrongful death.

53.   As a proximate result of ATCA's wrongful and negligent acts described in this Complaint, Carol Friday and Grieg Friday suffered and died.

54.   Plaintiff is entitled to recover damages for the survival damages and the wrongful deaths of Carol Friday and Grieg Friday.

55.   The damages that Plaintiff is entitled to receive include but are not limited to:

    A.    Funeral and burial expenses

    B.    The value of lost wages and benefits that Carol and Grieg would have earned if they had lived

    C.    The pain and suffering that Carol and Grieg endured before death, during the long 20 minute descent into the mountains with the pilot locked outside the cockpit pounding and demanding entrance as the aircraft sank.

    D.    The lost value of household services that Carol and Grieg performed

    E.    The loss of care, companionship, love and guidance that Carol and Grieg provided, and

F.   The pain and suffering that the Friday family endured due to the untimely death

**WHEREFORE**, Plaintiff demands judgment in amount to be determined by a jury but in excess of $75,000 for each Decedent exclusive of costs and any other relief in law or equity to which Plaintiff is entitled.

Respectfully Submitted,

*[signature]*

Jerome L. Skinner, Esq. (0014768)
LHD Lawyers US
P.O. Box 9300
Cincinnati, Ohio 45209
Phone: (513) 831-0044
Email: skinair64@yahoo.com

**OF COUNSEL:**

Matthew Berenger, Director
LHD Lawyers
Level 8, 151 Castlereagh Street
Sydney NSW 2000

Terrence L. Goodman, Esq. (0009148)
Law Office of Terrence L. Goodman, LLC
17 Heritage Road
Cincinnati, Ohio 45241